**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARK A. CASTILLO                              *

    Plaintiff                                   *

          v                                *          Civil Action No.  DKC-11-0396

WARDEN BOBBY P. SHEARIN, *et al*.          *

    Defendants                                *
                               * * *

<u>**MEMORANDUM OPINION**</u>

Pending is Defendants' Motion to Dismiss or for Summary Judgment.  ECF No. 18. Plaintiff opposes the motion.[1]  ECF No. 46.  Upon review of the papers filed, the court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

**Background**

Plaintiff Mark Castillo (Castillo) complains he has been subjected to harassment and physical assault due to the notoriety of his crime.[2]  The Complaint chronicles numerous instances where Castillo complained using the administrative remedy procedure (ARP) about harassment by officers, interception and interference with mail, and failure to protect him from the violent assaults of other inmates. ECF No. 1.

In an ARP dated November 30, 2009, Castillo alleged he was harassed by correctional officers Long and Kennell when he was not allowed to take a shower or participate in recreation for two days.  ECF No. 1 at Ex. 1A.  Castillo appealed to the Commissioner of Correction on January 10, 2010, when he did not receive a receipt from the Warden for this ARP.  *Id*. at Ex. 1B.  He also appealed the lack of a receipt for ARPs concerning an alleged attempted murder

---

[1] The Response in Opposition was filed with a Motion for Extension of Time (ECF No. 45) which shall be granted.

[2] Castillo pled guilty to murdering his three children.  ECF No. 1 at p. 12.

against him, an assault by Sgt. Thomas, the failure to provide daily recreation and showers, and requesting assistance with the ARP process. *Id*. One week later, in a letter dated January 17, 2010, Castillo wrote to the Commissioner indicating someone had fraudulently resubmitted an ARP so it would be dismissed for procedural reasons and that he never received receipts from the Warden with respect to other ARPs. When the Commissioner's office did not provide an appropriate response, Castillo filed an appeal dated February 28, 2010, with the Inmate Grievance Office (IGO). *Id*. at Ex. 1D. Letters from the IGO regarding Castillo's appeals indicated that it could not be determined whether he had exhausted the ARP process because he had not included the ARPs with his appeal. Additionally, a claim against the medical contractor was dismissed because the IGO does not have jurisdiction over the contractor and another claim regarding denial of recreation on one occasion was dismissed because it is not unconstitutional to deny recreation once. *Id*. at Ex. 1E. In a letter dated April 3, 2010, to the IGO, Castillo provided paperwork required for the appeals and clarified that he wanted the IGO to deal with the damage done by officers telling other inmates about his crime. *Id*. at 1F. On June 16, 2010, the IGO dismissed Castillo's appeals because it was unable to determine if the claims had been exhausted. *Id*. at Ex. 1H.

In an ARP dated December 25, 2009, Castillo complained that food was being used as a disciplinary measure because he was put on food loaf after he refused to give his tray back. He claimed the dietary change constituted punishment before a hearing. ECF No. 1 at Ex. 6A. On January 26, 2010, Castillo claimed Officer Capel offered another inmate an extra dinner tray to go into a recreation cage with Castillo and assault him. *Id*. Ex. 11A.

On January 20, 2010, Castillo was issued a disciplinary ticket for refusing to pack up his belongings for a move to C tier, which he describes as the "zap out tier." *Id*. at Ex. 12 A and B.

Castillo was pepper sprayed and forcibly extracted from the cell.  In his appeal of the adjustment hearing officer's decision of February 5, 2010, Castillo claimed he was only trying to get psychiatric help for the stress caused by being threatened when he was told to pack up.  *Id*. at 12B.

Castillo also complained that he was not receiving forms for sick call slips and for ARPs when he requested them.  *Id*. at Ex. 13.  In the ARP regarding access to forms, Castillo requested 10 ARP forms and 10 continuation sheets.  *Id.* The institutional response to the complaint indicated that sometimes the segregation tier where Castillo was housed at the time runs out of forms because of the high number of ARPs generated by the inmates confined to that tier.  *Id*.

Other ARPs filed by Castillo concern missing showers and recreation (ECF No. 1 at Ex. 14); placement of a disciplinary ticket under his cell door depriving him of the opportunity to list witnesses (*Id*. at Ex. 15); mental anguish caused by a "fraudulent ticket" (*Id*. at Ex. 16); improper reliance on a policy requiring assignment to administrative segregation because his sentence exceeds 50 years (*id*. at Ex. 17); staff allowed him to be attacked by his cell mate and he had not received medical care for a bite wound (*Id*. at Ex. 18B); outgoing mail not reaching its destination[3] and incoming mail being delayed (*Id*. at Ex. 19B, 19D, 23A, 27A, 39A and 39C[4]); failure to assign an institutional job (*Id*. at Ex. 20A,  20B, 20C); failure to assign to medium security (*Id*. at Ex. 21A and 21B); failure to provide receipts for ARPs filed with the Warden (*Id*. at Ex. 22A and 22B); Sgt. Cross discussing the nature of Castillo's crime with other officers so inmates could over hear (*Id*. at Ex. 24A); Officer Bauer commenting he hoped Castillo would be

---

[3] A response was provided to this complaint directing Castillo to first address his complaints regarding outgoing mail to the postmaster general of the United States Postal Service in Cumberland, Maryland and stating that Castillo did not provide the proof of mail not reaching its destination to investigation staff.  ECF No. 1 at Ex. 19C.

[4] In response to Castillo's claim that three certified letters were held for 19 days before being sent out of the institution, the Warden stated that an investigation revealed the letters were received on the day Castillo claimed they were mailed out of the institution.  ECF No. 1 at Ex. 39C.

struck by lightning and referencing the nature of his crime (*Id.* at Ex. 25A);  Sgt. Whitaker's refusal to assist Castillo with obtaining a "tote" (*Id.* at Ex. 26A); Officers Lowery and McKinney's refusal to allow Castillo to sign a disciplinary ticket[5] (*Id.* at Ex. 28A, 28B, 31); being denied commissary for two weeks (*Id.* at Ex. 29A, 29B, and 29C); failure to provide full relief requested or address all claims raised in ARPs (*Id.* at Ex. 29D); harassment[6] by housing unit one staff (*Id.* at Ex. 30 and 31);  not being allowed to inventory property at time of transfer from housing unit three to housing unit one (*Id.* at Ex. 32); harassment by Sgt. Cross[7] (*Id.* at Ex. 34B and 36); mail being returned because money vouchers are only used for large envelopes (*Id.* at Ex. 35A – C); Officer Tom denying recreation (*Id.* at Ex. 37); and certified mail envelope was returned by the institution[8] (*Id.* at Ex. 38).  The majority of Castillo's complaints were dismissed for procedural reasons.

Castillo's assertions that his life was threatened by other inmates were addressed by prison officials through assignment to a single cell and close monitoring any time he left his cell. ECF No. 18 at Ex. D, pp. 3, 7, and 18.  Ultimately, Castillo was transferred from North Branch Correctional Institution (NBCI) to Western Correctional Institution (WCI) because of three documented enemies at NBCI.  Records submitted by Defendants establish the circumstances

---

[5] Castillo also alleges that when he protested the refusal to allow him to sign the ticket, Sgt. Cross replied, "you aren't signing shit baby killer."  ECF No. 1 at Ex. 28A, p. 2.

[6] As examples of the harassment Castillo states the water to his toilet was turned off, he was denied: toilet paper, medication,  sheets and pillow case, ice, showers, mail, and  commissary and given bag meals.  ECF No. 1 at Ex. 30A.  In particular Castillo singles out Officer McKinney as being responsible for denying him showers and not allowing him to sign a Notice of Infraction.  *Id.* at Ex. 31.

[7] Castillo alleged that Cross reeked of beer, made inappropriate requests during a strip search, and referred to him as a "baby killer."  ECF No. 1 at Ex. 34B and 34E.

[8] The institutional response indicates the certified mail was returned to Castillo because he failed to include a money voucher for payment of certified mail delivery.  ECF No. 1 at Ex. 38C.

surrounding the enemy designation for Reginald Manning, Paul Graham and Steve Chadwick, all of whom were Castillo's cell-mates.

Castillo was celled with Reginald Manning on October 22, 2009, when he was assigned to administrative segregation at NBCI.  ECF No. 1 at Ex. 41B.  Castillo claims that Manning told him he was placed in the cell with him because the officers expected Manning to kill Castillo. *Id*.  Although Manning told Castillo he was not going to do what the officer expected of him, Manning assaulted Castillo on October 23, 2009.  *Id*.  Castillo claims he was severely injured during the assault and did not receive proper medical care.  *Id*.  Officer Wintes was called over to the cell and was told by Manning that Castillo was in need of medical attention. ECF No. 8 at Ex. A, p. 12.  Castillo was observed by the sink with blood on his face. *Id*.; *see also* ECF No. 46 at Ex. F.  The two men were then separated, Manning was placed in a holding cell and Castillo was taken to medical to await treatment.  ECF No. 8 at Ex. A, pp. 12 – 15.  Although Castillo was asked to provide a statement regarding the incident, he declined to do so.  *Id*. at p. 15. Manning claimed Castillo fell off of his bunk.  *Id*. at p. 16.

In an ARP dated May 27, 2010, Castillo alleged he was placed in a cell with Paul Graham in an effort deliberately to endanger his safety.  ECF No. 1 at Ex. 18A.  Castillo attempted to be assigned to a cell with other inmates to no avail.  Graham informed Castillo that he had already been written up for fighting with three prior cell mates.  Although Castillo does not say he overheard a plan to harm him by putting him in the cell with Graham, he concludes that it was done for that purpose.[9] Castillo alleges in an ARP that he noticed some of his commissary items had been taken, told Graham he had noticed missing items, and said he wanted it to stop.  *Id*.  The confrontation about the commissary items culminated in an altercation

---

[9] Castillo states, "I believe I was placed in there, in that cell with him, because he was so difficult."  ECF No. 1 at Ex. 18, p. 2.

between the two men on May 20, 2010, with Graham biting Castillo on the back of his shoulder in the process.  Castillo states he was able to stand up by the door after Graham began hitting him.  When he told an officer there was a problem, other officers were called and Castillo was moved to another cell.  ECF No. 8 at Ex. A, p. 18.  Castillo was found not guilty of any disciplinary rule violations in relation to the incident. *Id*. at p. 21.

Later Castillo complained that he was asked to go into the same recreation cage as Graham on August 23, 2010.  ECF No. 1 at Ex. 33.  When both men explained to the officers that they were enemies, Castillo and Graham were placed in separate cages for recreation.  The following day, Castillo and Graham were again expected to share the same recreation cage.  The two men again explained their history, but on this occasion Castillo claims Officer Tom told him he either had to share the cage with Graham or go back into his cell.  Castillo claimed placing him the same recreation cage with Graham was a purposeful attempt to place him in danger.[10] *Id*.

The third enemy, Steve Chadwick, was also Castillo's cell mate.  On August 17, 2010, Officer Gilpin witnessed Castillo and Chadwick engaged in a fist fight in their cell.  Both were "covered in blood" and were seen "exchanging closed fist punches to each other's head area." *Id*. at p. 26.  In his statement regarding the incident, Castillo claimed he had returned to his cell after receiving ice when Chadwick kept insulting him.  He put toilet paper in his ears to try to ignore Chadwick, but Chadwick jumped to his feet and started throwing punches at Castillo.  Castillo stated he tried to protect his face but Chadwick grabbed a chair and struck him in the head twice.  Castillo was able to get Gilpin's attention, help was called, and he was escorted to medical.  *Id*. at p. 27.  Castillo was found guilty of fighting with another inmate because during

---

[10] According to the response provided to Castillo's ARP, he was placed on "rec alone" status after the incident for the remainder of the time he was housed on housing unit one.  ECF No. 1 at Ex. 33C.

the adjustment hearing he admitted he was fighting with Chadwick and that he hit him. *Id*. at pp. 29 and 30. The sanction of 300 days segregation was subsequently modified to 150 days. *Id*. at pp. 31 and 33 - 34.

There is no evidence to support the conclusion that Graham and Chadwick attacked Castillo because they were made aware of the nature of his offense. With respect to the incident involving Graham and Castillo being placed in a recreation cage together following their altercation, the men were never actually in the cage together. Rather, when Officer Tom was made aware of the enemy situation that existed, Castillo was not put in the same cage with Graham. In addition, a recommendation was made for Castillo to receive recreation alone while he was on segregation in order to avoid any future incidents. ECF No. 8 at Ex. A, pp. 48 – 49.

### Injunctive Relief

While this case has been pending Castillo has contacted the court on a number of occasions claiming correctional officers were announcing his crime over the loud speaker in order to set him up for abuse by other inmates and alleging his legal papers were confiscated improperly. In one letter, Plaintiff claimed he had attempted suicide on three occasions, but those attempts apparently went undetected by prison staff.[11] ECF No. 4. This court required counsel to show-cause why Castillo's requests for injunctive relief should not be granted. With respect to claims that Castillo's crime was being announced to other prisoners, this court found there was "not enough evidence establishing that reckless or deliberate behavior on the part of the officers has created a known risk of harm to Plaintiff" ECF No. 9 at p. 8. On that basis, injunctive relief was denied.

Plaintiff was subsequently transferred from North Branch Correctional Institution (NBCI) to Western Correctional Institution (WCI). Although Plaintiff had asserted the need for his

---

[11] Plaintiff claims he no longer harbors any intent to harm himself. ECF No. 46.

removal from NBCI due to enemies being assigned to that institution, he takes issue with the transfer to WCI.  He claims the transfer was an attempt to thwart his efforts to litigate this case and that his assignment to protective custody subjects him to constant harassment by officers assigned to that housing unit.

Upon his transfer to WCI, Castillo filed a Motion for Injunctive Relief alleging all of his legal papers were removed from his cell by correctional officers for the purpose of harassing him.  ECF No. 20.  He further claimed that officers were announcing the nature of his crime over the intercom in order to incite other inmates violently to assault him and that officers were offering inmates payment to harm him.  He states that officers also pepper sprayed him for no reason, moved another inmate with a history of violence into his cell, and ignored all ARPs written complaining about the conditions.  In addition Castillo claims that three officers searched his cell, planted a weapon in his cell, and then did not charge him or his cell-mate with possession of the weapon.  *Id*.

An investigation into Castillo's allegation that inmates were being offered payment for causing him harm and that the nature of his crime was being announced revealed no evidence that such actions were taken.  Castillo's cell-mate was interviewed and denied ever hearing the nature of Plaintiff's crime or being offered any kind of compensation for hurting Plaintiff.  There is no evidence that Plaintiff was pepper-sprayed, but the allegation was referred to the Internal Investigations Unit for further review.  With respect to his legal materials, Defendants explain that each inmate, including Castillo, is permitted to have 1.5 cubic feet of paper in his possession.  Castillo had an excess amount of paper and he was provided an opportunity to select the documents that were relevant to any legal proceeding.  Defendants state that Castillo refused to select the paper work he wanted to keep and refused to sign a form acknowledging that it

would be taken from him.  Castillo filed an ARP regarding the confiscation and the paperwork was returned to him.  ECF No. 23 at Ex. A.

Castillo was assigned to protective custody upon his transfer to WCI for purposes of keeping him safe from potential harm from other inmates because of the notoriety of his crime and because information was received indicating that his life may be in danger.  Despite Castillo's stated desire to be moved to general population, he has been kept on protective custody status to insure his safety.  ECF No. 23 at Ex. A.

Defendants further state that since Castillo's transfer to WCI he has filed thirty-six ARPs, all of which have been answered or were being investigated at the time of Defendants' response. The matter regarding the weapon being planted in Castillo's cell during a cell search was investigated and found to be baseless.  There was no record of any contraband found during the search of Castillo's cell and an interview of his cell-mate, Thomas Legg, confirmed that no weapon was found in the cell.  Had a weapon been located in the cell, both Castillo and Legg would have been charged with a rule violation.  *Id.*

Castillo filed a Reply addressing Defendants' Response to Show Cause.  ECF No. 24.  He asserts that Defendants are lying about what actually occurred that there is a conspiracy among the staff as well as vast corruption with the staff.   Castillo believes Thomas Legg was harassed and told not to provide a statement to help him in this case.  He asks if this court is willing to subpoena Legg's parents whom he told about the knife being found in their cell; subpoena recorded phone conversations made by Castillo and Legg; and question all the other inmates present on the tier when the knife was allegedly found.  ECF No. 25 at p. 2.  Castillo further suggests that this court subpoena the video recording of the camera on the tier to establish that the officer exited his cell holding the knife in his hand.  *Id.*

Castillo further claimed he did not have his legal paperwork.  ECF No. 25 at pp. 2 - 6. By Order dated September 22, 2011, this court required specific paperwork regarding this case to be provided to Plaintiff and required verification from counsel that it had been received.  *See* ECF No. 28. Plaintiff was later provided with additional copies of documents pertaining to this case.  *See* ECF No. 33 and 41 (granting Castillo's request for a copy of the docket sheet and for a copy of the Complaint with Exhibits, and requiring a basefile review), *see also* ECF No. 35 (Defendants' response).   With respect to Castillo's other personal property, such as his appliances and hygiene items, there is no constitutional claim presented.[12]

Injunctive relief is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).  To obtain an injunction a movant must demonstrate:  1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest.  *See Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 129 S.Ct. 365, 374 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, _U.S. _, 130 S.Ct. 2371, 176 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

With respect to the allegations regarding the knife being planted in his cell, Castillo has failed to establish he has been harmed or that he will be harmed in the future if relief is denied. He was not subjected to punishment because a knife was allegedly found in his cell, and there is no evidence that Castillo has abandoned any constitutionally protected activity as a result of the alleged harassment. The pepper spray incident is also without any resulting injury.  Moreover the

---

[12] In the case of lost or stolen property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy.  *See Parratt v. Taylor*, 451 U. S. 527, 542-44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U. S. 327 (1986).  The right to seek damages and injunctive relief in Maryland courts constitutes an adequate post deprivation remedy.  *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).

incidents are not amenable to injunctive relief as there is no enforcement of a rule or policy that is potentially harmful to Castillo in the future.  To the extent the incidents occurred, the court will presume they were isolated in nature and will not occur in the future.  For purposes of Castillo's legal paperwork, this court has already granted injunctive relief by requiring provision of materials related to this case as well as documents contained in Castillo's prison base file. The Motion for Injunctive Relief is therefore denied with respect to matters unrelated to access to legal materials.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

<u>Failure to Protect</u>

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm. *Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987). "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency.   Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833– 34 (1994) (citations omitted).   "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id* at 837.  *See also Rich v. Bruce*, 129 F. 3d 336, 339– 40 (4th Cir. 1997).

The most serious allegations raised by Castillo concern his claims regarding the assault by Reginald Manning whom he claims was told by correctional officers to kill Castillo.  ECF No. 1 at Ex. 41B.  At the time of the assault, however, Castillo refused to provide a statement and Manning claimed Castillo had fallen from his bunk.    ECF No. 8 at Ex. A, pp. 15 and 16.

Defendants deny ever discussing Castillo's crime in front of other inmates and deny encouraging any inmate to attack Castillo or otherwise cause him harm.[13]  ECF No. 18 at  Ex. E at ¶4: Ex. F at ¶4; Ex. G at ¶4; Ex. H at ¶ 4; and Ex. I at ¶4.   Castillo does not allege he told correctional officers that Manning posed a threat to him prior to the assault, nor does he claim that his plea for intervention was ignored.  Even if Manning told Castillo that officers wanted him to kill Castillo, it does not necessarily mean those instructions were actually uttered by correctional staff.  The danger presented by Manning was not communicated to anyone by Castillo until after the assault occurred, despite the fact that he claims Manning told him he was told to kill Castillo. When Castillo did make staff aware of the threat, he presented it in an ARP.  ECF No. 1 at Ex. 41B.  Immediately after the assault occurred, the two men were separated and Castillo was escorted to medical for attention.[14]  ECF No. 8 at Ex. A, pp. 12 – 16; Ex. B, p. 10.  In light of Defendants denial that they ever encouraged an assault, and Castillo's failure to allege he alerted anyone of the danger posed beforehand, there is no evidence that Defendants knew of and disregarded a risk with respect to the assault by Manning.

Castillo also claims there was an attempt on his life when he was asked to share a recreation cage with Paul Graham on August 23, 2010.  ECF No. 1 at Ex. 33.  On the first

---

[13] In addition, Defendants assert that Castillo has a history of announcing his crime to other inmates and cite an e-mail note written by his case manager memorializing a phone call from a public defender. ECF No. 18 at Ex. D, p. 7.  Castillo denies he ever announced his crime to other inmates and denies even knowing the public defender who called.  ECF No. 46 at pp. 6 – 7.  The hearsay information provided by Defendants, together with Castillo's denial of the allegation, is weak at best.  As such, the court will assume Castillo did not engage in announcing his own crime to other inmates.

[14] Castillo alleges he was not provided medical care for his injuries. ECF No. 46. It is clear, however, that correctional staff brought him to the medical department for treatment and, to the extent there was a delay in receiving the proper treatment, Castillo has not named any medical personnel responsible for that delay.  Section 1983 liability on the part of the supervisory Defendants requires a showing that:  "(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F. 2d at 854 (internal citations omitted); *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984) (supervisory liability for an inmate's beating by prison guards).  There is no allegation or evidence that the named Defendants prevented Castillo from receiving medical care.

occasion he was asked to share the cage with Graham, the escorting officers were informed that by Castillo and Graham that they were enemies.  Upon learning that information, the two were allowed to use separate cages.  *Id.*; *see also* ECF No. 18 at Ex. D, pp. 18 – 19.   On the second occasion, Castillo was denied recreation because he would not go into the same cage as Graham and there were no other available cages for Castillo to use.  ECF No. 1 at Ex. 33.   The initial assault on Castillo occurred on May 20, 2010, but Graham was not noted as Castillo's enemy on August 23, 2010, when the two men were asked to share a recreation cage.  The issue of placing Graham on Castillo's enemy list was first addressed on September 2, 2010.  ECF No. 46 at Ex. I.   Graham was moved to disciplinary segregation following the assault and it is unclear from the record whether Castillo was confined elsewhere in the institution until August when the issue arose regarding recreation.   In any event, failing to note Graham as an enemy for over three months is not evidence of deliberate indifference to Castillo's safety.   When the oversight was noted, it was corrected quickly. *See* ECF No. 18 at Ex. D, pp. 18 - 19 (ARP investigation notes indicating staff acted to protect Castillo when made aware of enemy situation).   Failure to add Graham's name to Castillo's enemy list was, at most, negligence which is insufficient to establish a constitutional claim.  *See Farmer v. Brennan*, 511 U. S. 825, 837 (1994) (requiring actual intent or reckless disregard of an excessive risk to safety).

Castillo's claim that he was placed in the cell with Graham in the first place because he is a difficult person and officers wanted to see harm come to Castillo, is without objective evidence to support it.  Castillo's belief that officers dislike him because of the nature of his crime, even if it is verifiable, is simply not sufficient to establish that prison officials have set out to gratuitously allow violent attacks to occur against him.  The objective evidence establishes the opposite; each time a problem arose measures were taken to insulate Castillo from other inmates

that may mean him harm. To the extent that protecting him from the violence of other inmates means Castillo does not have access to programs or other privileges afforded to general population inmates, those limitations are constitutionally permissible. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (assignment to administrative segregation alone does not implicate a liberty interest).  "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976), s*ee also Sandin v. Conner*, 515 U.S. 472 (1995), requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest.

<u>Administrative Remedy Procedure</u>

Castillo's claim that the rules governing the administrative remedy procedure are not observed and that he is thereby denied access is a claim that he is denied access to courts. Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U. S. 817, 821 (1977).  However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated

challenges to sentences or conditions of confinement before the courts.' *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) *quoting Lewis*, 518 U.S. at 355.  "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349.

Castillo's claims regarding processing of ARPs concern failure to provide him with a receipt, failure to observe time requirements, and dismissal of his claims on procedural grounds that do not apply.[15]  Castillo seeks to have the ARPs submitted as exhibits viewed both individually and collectively to establish a pattern of neglect and abuse.  ECF No. 46 at p. 3. Many of Castillo's complaints concern matters related to the daily management of the prison. His assertions that he is denied showers and recreation concern isolated events, not an outright denial of all showers and all recreation.  Management of a large prison facility inevitably results in some inefficiency, mistakes, and possible oversights, but those inefficiencies and mistakes are not prohibited by the Constitution.  Even viewed collectively, Castillo's ARP claims do not evidence a deliberate effort to impose cruel and unusual punishment.  Any inability to litigate the claims asserted falls within the category of "incidental (and perfectly constitutional) consequences of conviction and incarceration." *Lewis,* 517 U.S. at 355.  To the extent that the administrative remedy procedure could be run more effectively or beneficently, it is not the role of this court to implement those changes.  *See Sandin,* 515 U.S. at 482 (expertise of prison officials must be given due deference).  Castillo has failed to show that any of the problems he has had with the ARP process has prevented him from challenging his conviction or filing a

---

[15] Many of Castillo's ARPs are dismissed on the basis that they contain more than one claim; however, the multiple claims cited are frequently examples Castillo has provided in an effort to make his point.

federal civil rights complaint and has therefore failed to show an actual injury.  *See O'Dell*, 112 F. 3d at 776.

Castillo's claims regarding disciplinary proceedings and being denied the opportunity to name witnesses, also lacks merit.  There is no indication that Castillo challenged the manner in which he was served with the Notice of Infraction at the adjustment hearing and requested witnesses that would have otherwise been permitted, but were denied. With respect to the infraction he received for holding the slot in his door open, Castillo admits repeatedly to doing the prohibited act, but claims it is done by all inmates on segregation when they wish to see or talk to a supervisory officer. ECF No. 1 at Ex. 40A – 54C; ECF No. 46 at p. 13. Witnesses to verify that fact would not have exonerated Castillo of the charges sparing him from additional segregation time.[16]  With respect to other disciplinary proceedings, Castillo seeks to introduce the video tape from the cameras on the tier as a witness.  There is no evidence that the video is a permitted witness in disciplinary hearings.  In short there is no actual injury resulting from Castillo's inability to list witnesses on the notices of infraction he received.

## Mail

Castillo raises numerous claims that his mail, incoming and outgoing, is either delayed or never delivered. Prisoners have a First Amendment right to send and receive mail.  *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).   In considering whether policies regarding mail are constitutionally valid, a distinction is drawn between incoming and outgoing mail; a

---

[16] Because Castillo is serving three life sentences without the possibility of parole, he does not earn diminution of confinement credits and is not subject to forfeiture of credits for disciplinary violations.  ECF No. 18 at Ex. C, p. 1. A protected liberty interest exists where revocation of diminution of confinement credits is at stake. *See Wolff v. McDonnell*, 18 U.S. 539, 557 (1974).  Where no revocation of credits is at stake, a protected liberty interest only arises if there is a showing of "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483– 84 (1995) *see also Riccio v. County of Fairfax*, 907 F.2d 1459, 1456 (4th Cir. 1990) ("a state does not necessarily violate the constitution every time it violates one of its rules."); *Ewell v. Murray*, 813 F. Supp. 1180, 1183 (W.D. Va. 1995) ("Even if state law creates a liberty interest, violations of due process are to be measured against a federal standard of what process is due.").

lower level of scrutiny applies to policies regarding incoming mail.  *Id*. at 413.  Prohibition of incoming materials from publishers (*see Thornburgh* at 408) requires the showing of a greater, legitimate security interest than policies concerning other types of mail.  *See Altizer v. Deeds*, 191 F. 3d 540, 548 (4th Cir. 1999) (inspection of outgoing mail serves legitimate penologicial purpose).  Likewise, policies concerning legal mail require heightened scrutiny, but isolated incidents of mishandling of mail do not state a claim.  *See Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir.1990) (requiring a showing of improper motive or interference with access to courts); *Buie v. Jones* 717 F. 2d 925, 926 (4th Cir. 1983) (isolated incident of mishandling does not show actionable pattern or practice).

Castillo's complaints concerning outgoing correspondence with family members appear to be isolated incidents not necessarily due to mishandling of his mail by prison staff.  A number of his claims regarding mail were referred to the post-master for investigation (*see* ECF No. 1 at Ex. 19B, 19D, 23A, 27A, 39A and 39C); thus, it is unclear that any of the named Defendants are directly responsible for mail not reaching its intended destination. There is no allegation that Castillo's mail is being censored and no evidence that it is deliberately misdirected.

With respect to legal mail, Castillo has provided evidence that his legal mail to the IGO was significantly delayed resulting in a dismissal of his claim as untimely.  ECF No. 46 at Ex. A. He appealed the dismissal to the Circuit Court for Allegany County and it was reversed and remanded for a hearing.[17]  *Id*.  The IGO complaint concerned an appeal of a 45 day segregation sentence imposed in a prison disciplinary proceeding.  Castillo's assertion of a conspiracy to delay his mail to the IGO is speculative at best.  Moreover, there is no evidence the alleged

---

[17] It is unclear why strict time limitations are imposed by the IGO without regard to the date complaints are entrusted to prison officials for mailing.  *See Houston v. Lack*, 487 U.S. 266 (1998).

pattern or practice regarding Castillo's legal mail to the IGO[18] resulted in the loss of opportunities to challenge unconstitutional conditions of confinement.  His appeals of adjustment convictions do not implicate a protected liberty interest in light of the fact that he does not earn, nor does he lose, diminution of confinement credits. *See Sandin*, 15 U.S. at 483– 84 (requiring atypical and significant hardship to implicate liberty interest).

<u>Retaliation</u>

Castillo claims he was transferred from NBCI to WCI in retaliation for the instant case. ECF No. 46 at p. 14.  Additionally, he attributes most, if not all, decisions regarding his housing assignments and property confiscation as efforts to retaliate against him for complaining. ECF No. 1 and ECF No. 25.   In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).   It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment.   *Compare Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim).   "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill

---

[18]  Castillo admits in his Response in Opposition that the delayed legal mail only concerns mail sent to the IGO. ECF No. 46 at pp. 17 – 18.

> individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408
> U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's
> rights, there is no need for the protection provided by a cause of action
> for retaliation. Thus, a showing of adversity is essential to any retaliation
> claim.

*AC LU of Maryland, Inc. v. Wicomico County*, Md.  999 F.2d 780, 785 (4th Cir. 1993).

"In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).  Castillo has shown no adversity resulting from the alleged retaliatory actions against him that do not reflect the ordinary adversity resulting from incarceration itself.  His claims regarding retaliation must fail.

Castillo claims he has suffered emotional distress as a result of the harassment he has experienced and states he attempted to commit suicide on three separate occasions.   ECF No. 46 at p. 18; ECF No. 4.   He states there is no documentation of these attempts because he was not trying to get attention or help.  ECF No. 46 at p. 18.  Although the court is sympathetic to the distress experienced by Castillo, it is clear from this record that Defendants took action to protect him from being violently assaulted by other inmates when he was transferred to WCI and placed on protective custody.  ECF No. 18 at Ex. D, p. 7.  In addition, they deny harassing Castillo.  *Id.* at Ex. E – I.

### Conclusion

In light of the evidence as well as the absence of actual injuries with respect to the claims noted, Defendants are entitled to summary judgment in their favor.  A separate Order follows.

Date:   March 23, 2012                                    /s/
                                          DEBORAH K. CHASANOW
                                          United States District Judge